Ray SOUTHWELL, Plaintiff,

v.

The SOUTHERN POVERTY LAW CENTER, Defendant.

No. 1:95–CV–444.

United States District Court,
W.D. Michigan,
Southern Division.

Dec. 30, 1996.

**1304**

Mark D. Osterman, Ithaca, MI, for Plaintiff.

Jon R. Muth, Miller Johnson Snell & Cummiskey, Grand Rapids, MI, for Defendant.

## OPINION OF THE COURT

McKEAGUE, District Judge.

### I. FACTUAL BACKGROUND

Plaintiff, Ray Southwell, is a Michigan resident who originally filed this libel suit in the Circuit Court for Emmet County, Michigan. Defendant, Southern Poverty Law Center, is an Alabama non-profit corporation with its principal place of business in Montgomery, Alabama. Defendant removed the case to this Court on June 30, 1995, alleging diversity of citizenship and the statutory amount in controversy. Plaintiff is the co-founder of the Northern Michigan Regional Militia, ("Michigan Militia"), and served as both its information officer and chief of staff. The Southern Poverty Law Center, through a project known as Klanwatch, publishes a quarterly newsletter aimed at monitoring the activities of the Ku Klux Klan and other white supremacist groups. The newsletter, known as the *Klanwatch Intelligence Report* ("*KIR*"), is mailed free of charge to 6,000 law enforcement agencies, human rights groups and media sources across the nation.

Plaintiff's amended complaint contains three counts, which allege that defendant defamed and libeled plaintiff and placed plaintiff in a false light in a December 1994 issue of *KIR*.[1] The allegedly defamatory

---

1. The article, which begins on the front page of *KIR*'s 16-page newsletter, is titled: "Racist Extremists Exploit Nationwide Militia Movement." Directly below this headline on the front page is a photograph of plaintiff with the caption: "Michigan militia leader, Ray Southwell, recently met with Aryan Nations regional director, Bobby Norton, in Tennessee." On page four of the newsletter, plaintiff's name is listed under a small chart with the headline: "Militias with known racist ties." Later, on page seven, plaintiff is the twelfth of 15 militia leaders profiled. The two paragraphs devoted to plaintiff state in their entirety:

Southwell launched the Northern Michigan Regional Militia in 1993 from his home town of Alanson. While he denies any racist ties, Southwell, a deacon in his local Baptist church, is in frequent communication with Trochmann and Wickstrom.

According to sources in Michigan, Southwell recently traveled to Tennessee for a meeting with Bobby Norton, the Southeastern Director for Aryan Nations. Southwell told Klanwatch that he "would meet with Satan himself if it would help the militia movement."

material included a photo of Southwell along with accompanying text which stated: "According to sources in Michigan, Southwell recently traveled to Tennessee for a meeting with Bobby Norton, the Southeastern Director for Aryan Nations."[2] Aryan Nations is identified in the article as a white supremacist organization with a violent past. Southwell and Norton have both denied, in separate depositions, that Southwell attended an Aryan Nations meeting, which Norton admits took place at his home on December 3, 1994. Defendant claims that a previously reliable confidential source telephoned a *KIR* investigator and informed the investigator both before and after the meeting in Tennessee that Southwell would be and had been in attendance. Southwell denies attending and claims his alibi witnesses can prove he was at a family Christmas party in northern Michigan at the time the article infers he was in Tennessee.

Prior to the close of discovery in this case, plaintiff moved to compel defendant to disclose the name of the confidential source that was the basis for the article. Defendant claims the First Amendment protects it from having to disclose any information that would compromise the safety of its confidential source. On August 16, 1996, the magistrate judge to whom this motion was referred ruled defendant must disclose the information to plaintiff and plaintiff's counsel. This Court stayed disclosure until it could consider defendant's pending motion for summary judgment. *See* Opinion, September 25, 1996. A hearing was held on this motion on November 4, 1996. After carefully considering the parties' arguments, this Court is now ready to issue its opinion. The first part of the opinion addresses defendant's motion for summary judgment. The second part addresses plaintiff's request that any such ruling be delayed until the Court orders disclosure of defendant's confidential source.

## II. *New York Times* Standard

■ Plaintiff, who as chief spokesman for the Michigan Militia gained national media attention prior to the *KIR* article, concedes that for purposes of this litigation he is a "limited-purpose public figure."[3] As such, to prevail on his claims, it is not enough for plaintiff to simply satisfy the elements of a libel action under Michigan law; he must instead meet the much more rigorous constitutional standard the Supreme Court imposed on states via the First and Fourteenth Amendments. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[4] "A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false 'statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 659, 109 S.Ct. 2678, 2681, 105 L.Ed.2d 562 (1989) (quoting *New York Times*, 376 U.S. at 279–280, 84 S.Ct. at 726). A "reckless disregard" for the truth, requires more than a departure from reasonably prudent conduct. *Id.* at 688, 109 S.Ct. at 2696. Although there is not one infallible definition for the concept of "reckless disregard," the Supreme Court has made clear a defendant must have made the false publication with a "high degree of awareness ... of probable falsity," or must have "entertained serious doubts as to the truth of his publication." *Id.* at 667, 109 S.Ct. at 2686 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)).

■ Unlike most negligence actions where the fact finder is asked to apply an *objective* standard to measure a defendant's conduct, the standard in a public figure defamation action is a "*subjective* one." *Harte–Hanks*,

2. Plaintiff also contends he was defamed by the chart accompanying the article. To the extent this chart is a fair comment on the alleged defamation contained in the article, it need not be considered separately by the Court.

3. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

4. Plaintiff appears to be confused about why Michigan courts must follow the *New York Times* standard and instead suggests in his brief that Michigan courts have voluntarily elected to "follow Supreme Court decisions on the standards for libel actions." Plaintiff's Response, p. 5.

491 U.S. at 688, 109 S.Ct. at 2696 (emphasis added). Therefore, to prevail it is not relevant whether a prudent journalist would have exercised more caution than a particular defendant, "or would have investigated before publishing," instead "there must be sufficient evidence to permit the conclusion that [this] defendant in fact entertained serious doubts as to the truth of the publication," or "actually had a high degree of awareness of probable falsity." *Id.* (quoting *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325).

The Supreme Court acknowledged the burden such a high standard would place on public figure plaintiffs in libel actions, but defended it on the grounds that "the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *St. Amant,* 390 U.S. at 731–32, 88 S.Ct. at 1326. The Court added that:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is *fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.* Nor will they be likely to prevail when the publisher's allegations are so *inherently improbable* that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* (emphasis added).[5] In *Harte–Hanks,* the Court said that actual malice cannot be established by proving ill will, pecuniary interest or a reporter's failure to investigate.

*Harte–Hanks,* 491 U.S. at 667, 109 S.Ct. at 2685–86.

### III. Summary Judgment Standard

The higher standard of proof public figure plaintiffs must meet at trial also applies at the summary judgment stage. "Consequently, where the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the *evidence in the record* could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that plaintiff has not." *Id.* (emphasis added).

The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. *Id.* Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id.*

### IV. Analysis

Plaintiff contends in his first amended complaint that he was defamed by defendant's article because it said plaintiff had traveled to Tennessee to visit Bobby Norton, a leader in the Aryan Nations, a white supremacist organization with a violent past.[6] While plaintiff has presented considerable evidence which appears to raise serious doubts about the actual accuracy of this

---

**5.** Plaintiff can point to no evidence in the record that suggests defendant's actions even came close to this kind of reckless conduct. See analysis, *infra.*

**6.** Although this Court retains some doubt as to whether, as a matter of law, this statement is even defamatory—given that plaintiff has admitted meeting with two other men identified as racists—defendant has not raised this issue.

statement,[7] the question before this Court is not whether the alleged defamatory statement was true or false. Instead, the inquiry must focus on whether defendant's employees entertained serious doubts about the accuracy of this story before it was sent to the printer on December 15, 1994. To defeat defendant's motion for summary judgment, plaintiff must present sufficient evidence to convince this Court that a reasonable jury could find by "clear and convincing evidence" that defendant published the alleged libel with actual malice. Plaintiff conceded at oral argument he has no proof of actual malice, but argues he has at least made out a case for recklessness. After reviewing plaintiff's proofs, this Court finds that plaintiff has not provided a single piece of evidence that would help him satisfy the high legal burden he faces under *New York Times*.

Obviously, the most compelling evidence in this kind of case would be any proof plaintiff could provide that defendant's employees, in their own words or deeds, seriously doubted the accuracy of their story before it was published.[8] While such damning evidence is likely to be available only rarely, it is certainly not present here. In fact, the evidence suggests that even after plaintiff called Joseph T. Roy, the publication's chief investigator, on December 12, 1994, to refute the accuracy of the story and deny his traveling to Tennessee to meet with Bobby Norton, Roy adamantly insisted the story was correct.[9] The record also shows that after the telephone call, Roy checked back with the source one more time to confirm that the initial reports were accurate. While Roy's comments may have simply been defensive or self-serving, they do not support plaintiff's argument that defendant or its employees

entertained serious doubts about the accuracy of the story.

In their affidavits and depositions, both Roy and J. Michael Reynolds, the editor of *KIR*, strongly denied any suggestion they doubted the accuracy of the story. This Court has reviewed defendant's sealed Exhibit 19, which purports to be the notes Roy took on November 11 during an unsolicited telephone call he received from a confidential source about a meeting at Norton's house in Tennessee on November 5, 1994. The Court finds these notes are quite detailed. The confidential source described the number of persons present at the meeting, the license plate number of a car driven by one of those present, the nature of what was said at the meeting, and specifically named which officials were present. Perhaps most significantly, in his call to Roy the source accurately predicted three weeks in advance of its occurrence that another Aryan Nations meeting would be held at Norton's house on December 3, 1994. Although both Norton and plaintiff deny that plaintiff attended the December 3, 1994 meeting, neither denies that the meeting occurred. Norton's own notes of the December 3, 1994 meeting indicate the group present had a "discussion on militia." Norton Deposition, Exhibit 2. Two days after the meeting, Roy received another call from his confidential source. In defendant's sealed Exhibit 20, Roy's notes of this December 5, 1994 telephone conversation with this source also provide a rather detailed description of the December 3, 1994 meeting at Norton's house. Neither Norton nor plaintiff have disputed that the Aryan Nations meeting took place. Defendant's employees have indicated throughout the record that they were confident in the information pro-

---

7. Indeed, defendant has not raised "truth" as a defense and its initial offer to publish a retraction of this statement suggests that at that time it at least doubted its accuracy. At oral argument, defendant's counsel stated that for the purpose of this motion defendant would concede the story's falsity. However, he indicated that if the matter proceeded to trial, defendant may offer evidence supporting the accuracy of its initial report.

8. Plaintiff contends that because defendant's confidential source was paid for his or her information, the source should be considered an employee of defendant. However, neither party has

provided the Court with any details upon which to weigh this assertion. Since plaintiff has failed to carry his burden on this issue, the source will not be considered an employee of the defendant.

9. "We're gonna stand with that information." Transcript of December 12, 1994 telephone call between plaintiff and Roy. Defendant's Exhibit 21, p. 2. "We were able to corroborate it." *Id.* "[Y]ou were there and I know you were there and you know, that's all I've got to say on that matter." *Id.* at 4. "We are very careful about what we print. We are very sure ..." *Id.* at 6.

vided by this confidential source, in part, because the source had been reliable in the past. The mere fact that the source accurately predicted three weeks in advance when and where an Aryan Nations meeting would occur at a private individual's house, supports defendant's reasonable reliance on this source.

A review of the entire record also shows that defendant's employees would have had no reason to believe that plaintiff's attendance at such a meeting was "inherently improbable." Instead, defendant persuasively points to three different things which support the probability of such a meeting. First, plaintiff has admitted spending time with John Trochmann [10] and having spoken on the phone with James Wickstrom,[11] both of whom *KIR* named as leaders in the white supremacist movement. Second, plaintiff's own statements that he would be willing to "sit down with Satan himself to talk about the militia ..." gives the impression that plaintiff himself would be willing to meet with anyone, racist or not, to talk about the militia movement. Third, and perhaps most telling of all, when asked by Reynolds, the *KIR* editor, if he would consider speaking at the Aryan Nations World Congress, plaintiff did not express surprise or outrage at the suggestion. Instead, the transcript shows he laughed and said: "I certainly wouldn't now." [12] All three facts lend support to de-

fendant's position that its employees had no reason to doubt the information from their confidential source. Although plaintiff has not argued that the story was inherently improbable, defendant's evidence would refute such a contention and bolsters defendant's argument that its employees lacked actual malice.[13] Given the significant weight of the evidence defendant has supplied supporting an absence of malice by its employees, the Court now considers whether the nonmoving plaintiff has presented substantial evidence of malice to raise a genuine issue of material fact for a jury to consider.

An analysis of his somewhat confusing brief shows that plaintiff appears to rely on four different facts to support his position that defendant's employees "entertained serious doubts" about the story: (1) depositions by Norton and plaintiff prove plaintiff did not attend any meeting in Tennessee on December 3, 1994; (2) defendant's newsletter unfairly mentioned plaintiff's denial of racist ties in the same sentence in which plaintiff is described as a "deacon in his local Baptist church;" (3) defendant has conceded its confidential source was not from Michigan as the story indicated; and (4) defendant's story inaccurately quoted plaintiff regarding his willingness to meet with Satan to discuss the militia. The Court now considers each of these claims in turn.

10. In its brief, defendant identifies Trochmann as the founder of the Montana Militia and a speaker at the 1990 annual meeting of the Aryan Nations, a group it said he is closely aligned with. Plaintiff does not challenge this description of Trochmann's activities and admits he spent time with Trochmann in New York City in November 1994 after both men appeared on the Phil Donahue Show.

11. In its brief, defendant identifies Wickstrom as an anti-Semitic Identity minister, who was national leader of the Posse Comitatus, an anti-government white supremacist group with a history of violence. Wickstrom was recently released from prison after serving time for his conviction for conspiracy to counterfeit in a scheme to buy arms for the Posse Comitatus. Plaintiff does not challenge defendant's description of Wickstrom's activities and admits he spoke with him on the telephone about buying some t-shirts.

12. Transcript of November 1, 1994 telephone call between plaintiff and *KIR* editor Mike Reyn-

olds, p. 4. The obvious inference the Court draws from this exchange is that plaintiff might have agreed to give such a speech prior to his interview with *KIR* if he thought it would go unreported by the media.

13. These three facts also raise questions in the Court's mind, as has already been indicated, as to whether plaintiff can actually make out a colorable claim that defendant's article is defamatory. Although the Court need not consider this issue to resolve this motion, it wonders how a plaintiff who has admitted ties with two individuals described as racists can claim he has been defamed by a defendant who erroneously links him in an article with a third individual described as a racist. Perhaps having ties to three racists is worse for one's reputation than having ties to two racists, but given the de minimis damages that one would suspect could be shown by the link to the third racist, the distinction hardly seems worthy of a costly trial.

First, the fact that plaintiff has presented strong evidence that he did not meet with Norton on December 3, 1994 has no bearing on the state of mind of defendant's editor and investigator before they published a story quoting sources as indicating such a meeting took place. Proving a fact is false after publication does not establish that defendant knew or should have known it was false prior to publication. A review of the detailed notes Roy took during his conversation with defendant's confidential source tends, if anything, to bolster defendant's contention that its employees had reason to believe in the accuracy of the information. Although plaintiff called Roy prior to publication denying his attendance at the meeting with Norton, he failed to provide any proof, other than his own denials, that he was not present.

Second, this Court can not ascertain what plaintiff means in his brief when he characterizes as false "the assertion that the fact Plaintiff denied racist ties should be compared to this (sic) being a deacon in the Baptist Church." Plaintiff's Response, p. 7. If anything, the inclusion by defendant of the phrase "While he denies any racist ties...." would appear to refute plaintiff's accusation of actual malice because it shows defendant's employees were attempting to balance their story with plaintiff's denial. Leaving out such a denial—even though defendant was aware of it—would have supported plaintiff's claim that defendant published the story with reckless disregard for the truth.

Third, plaintiff argues malice can be inferred because the story falsely stated that defendant learned about the alleged meeting from "sources in Michigan" when instead it appears there was one source who was in fact not in Michigan. Defendant concedes in its response that this portion of the article was "admittedly untrue," but defends this intentional false statement on the grounds that it was done to "protect the identity of the actual confidential source who lived elsewhere." This Court finds defendant's decision to deliberately mislead its readers as to the geographical location of its source disturbing given that there were clearly other ways to conceal the source's identity without printing false statements.[14] But the deception is not material and appears harmless when considered in the context of the story's allegedly defamatory content. Plaintiff has not alleged that his reputation suffered greater injury because defendant quoted sources in Michigan when there was in reality one source located elsewhere.[15] At oral argument, plaintiff contended that proof that defendant intentionally misled readers on this minor point is circumstantial evidence of a larger conspiracy by defendant to recklessly defame plaintiff. This argument is not persuasive.

Fourth, plaintiff claims proof that defendant misquoted him in the article also supports a finding of actual malice. In its article, defendant quoted plaintiff as saying: "Southwell told Klanwatch that he 'would meet with Satan himself if it would help the militia movement.'" According to the transcript of the telephone conversation plaintiff had with Reynolds, the KIR editor, plaintiff actually said: "I have said in the past that I would sit down with Satan himself to talk about the militia if it's an opportunity to get the word out to the people." Defendant's Exhibit 14, p. 4. While defendant's failure to accurately quote the subject of a news story when its employees had a tape recording of the exact words plaintiff used is troublesome, given that this was not a breaking story,[16] it also appears relatively harmless here where

---

**14.** Defendant could have simply not said where its source was located.

**15.** Plaintiff's main concern seems to have been that by failing to accurately describe where the confidential source was from, defendant has impaired plaintiff's repeated efforts during discovery to locate, identify and depose defendant's confidential source. Plaintiff's preoccupation with finding and exposing defendant's confidential source raises some concern as to whether the search for and apparent desire to "out" the source was perhaps the hidden purpose behind plaintiff bringing this litigation in the first place.

**16.** Editing the exact words used in quotes is strongly disfavored by practicing journalists. Editorial, *Credibility is the issue when quotations are altered*, The Phoenix Gazette, November 6, 1994, G2 ("Journalists, from cub reporters to the crustiest of foreign correspondents" are "taught quotes are sacred, that one alters them at peril to both self and publication.")

the message being communicated has not been significantly altered.[17] At oral argument, plaintiff's counsel unpersuasively contended the published quote, taken out of its proper context, made his client look impious. Defendant argues any differences between the two quotes are "immaterial." This Court agrees and fails to find any significant legal difference between the statement plaintiff is recorded as having said and the inaccurate quotation in defendant's article.

Finally, plaintiff says all of this evidence points to the likely conclusion that defendant's confidential source simply does not exist—that it is a figment of defendant's imagination, created post-publication to defeat this litigation. Plaintiff has yet to produce any credible evidence to support this contention. Plaintiff's counsel, at oral argument, said he bases this theory on two things: (1) the fact that defendant initially lied about the location of its confidential source, and (2) his "instincts." Defendant has supplied the Court with a sufficient non-pretextual reason for reporting that its source was from Michigan, not Tennessee. Plaintiff's "instincts" are not record evidence this Court can consider in weighing this motion. As stated earlier, this Court finds the notes of the conversations with defendant's confidential source to be highly detailed and containing no obvious inconsistencies or other fabrications. If these notes were more suspicious or there was some other colorable proof the source did not exist, this Court would not hesitate to order disclosure. But such is not the case here. For these reasons, this Court is satisfied that defendant's confidential source does exist and rejects plaintiff's argument to the contrary.

The foregoing analysis illustrates that based on the voluminous record now before this Court, plaintiff cannot point to any material evidence that supports his claim that defendant published its article with actual malice. Plaintiff contends in his brief that

"there exists more than a mere scintilla of evidence of malice." This Court does not agree. Plaintiff has not produced "more than a mere scintilla" of evidence of actual malice. Even if he had, such an insubstantial amount would not be enough for plaintiff to defeat summary judgment. The Supreme Court has made it clear that a public figure plaintiff must provide substantial evidence that he can prove actual malice by clear and convincing evidence, even at the summary judgment stage. *See Liberty Lobby, supra.* Plaintiff has failed to overcome defendant's overwhelming evidence that its employees lacked actual malice. As a result, defendant's motion for summary judgment will be granted.

## V. Disclosure of Defendant's Confidential Source

Plaintiff argues that it is premature for this Court to consider defendant's motion for summary judgment without first ordering defendant to disclose the identity of its confidential source. Plaintiff admitted at oral argument that based on the record now before this Court, he lacks evidence to prove defendant acted with actual malice. Yet, plaintiff argues, because he cannot prove actual malice without deposing the source, it is improper for this Court to consider that issue prior to disclosure. Plaintiff cites no authority for this contention.

■ A motion to compel discovery is addressed to the sound discretion of the district court. *LaRouche v. National Broadcasting Co., Inc.,* 780 F.2d 1134, 1139 (4th Cir.1986). "This remains true even when the object of discovery is a journalist's confidential source." *Id.* A court may deny disclosure of a confidential source where the record supports a defendant's motion for summary judgment. See *Schultz v. Reader's Digest Association,* 468 F.Supp. 551, 567 (E.D.Mich. 1979). In *Schultz* the court noted that ordering

---

17. In *Masson v. The New Yorker Magazine,* the Supreme Court considered the issue of how much a quotation would have to be intentionally altered by a journalist before it would rise to the level of proof of actual malice. The Court concluded that: "a deliberate alteration of the words uttered by a plaintiff does not equate with knowl-

edge of falsity for purposes of *New York Times v. Sullivan* unless the alteration results in a material change in the meaning conveyed by the statement." *Masson v. The New Yorker Magazine,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991). This alteration clearly fails to meet such a standard.

disclosure of anonymous news sources without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of state libel laws. Such a course would also overlook the basic philosophy at the heart of the summary judgment doctrine.

*Id.* (quoting *Cervantes v. Time, Inc.,* 464 F.2d 986, 992–93 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973)).

█ Under *Schultz,* summary judgment is proper even without disclosure of a confidential source, if the plaintiff fails to produce evidence that the article in question is either (1) inherently improbable, or is (2) published with serious doubts about the truth of its contents. *Schultz,* 468 F.Supp. at 568. "The point of principal importance is that there must be a showing of cognizable prejudice before the failure to permit examination of anonymous news sources can rise to the level of error." *Id.* (quoting *Cervantes,* 464 F.2d at 994.) [18]

On the other hand, both *Schultz* and *Cervantes* held that "where there is a concrete demonstration that the identity of defense news sources will lead to persuasive evidence on the issue of malice, a District Court should not reach the merits of a defense motion for summary judgment until and unless the plaintiff is given a meaningful opportunity to cross-examine those sources, whether they are anonymous or known." *Schultz,* 468 F.Supp. at 567.

Following this analysis, the Court must determine whether under *Schultz,* plaintiff has made a "concrete demonstration" that disclosure of defendant's confidential source will provide "persuasive evidence on the issue of malice." To properly decide this issue, the Court must also consider the extent to which defendant may have either a constitutional or common law privilege as a journalist to refuse to disclose the identity of its confidential source.

Neither the United States Supreme Court [19] nor the Sixth Circuit [20] has spelled out the exact extent of a reporter's privilege under the First Amendment to refuse to disclose a confidential source in public figure defamation cases where the reporter is a party to the dispute. [21] However, nine of the twelve federal circuit courts of appeals have recognized a qualified privilege for reporters and their sources in civil proceedings. [22] Al-

---

**18.** As the Court has already indicated, plaintiff has failed to produce any compelling evidence that the story was inherently improbable or that defendant's employees entertained serious doubts as to its accuracy.

**19.** In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court refused to recognize an absolute privilege under the First Amendment for reporters to shield the names of their confidential sources. However, the Court narrowed its holding to cases in which a reporter has been called to testify before a grand jury and the confidential source has alleged to have witnessed or participated in a crime. Since *Branzburg,* the Court has not explicitly ruled on the reporter's privilege in a civil context, and many lower federal courts "have read *Branzburg* to create a qualified privilege." Bradley S. Miller, *The Big Chill: Third–Party Documents and the Reporter's Privilege,* 29 Mich. J.L.Ref. 613, 619 (1996).

**20.** In re *Grand Jury Proceedings,* 810 F.2d 580 (6th Cir.1987), the only Sixth Circuit opinion addressing the topic of confidential sources, like *Branzburg,* considered the narrow issue of whether a reporter could refuse to comply with a grand jury subpoena. The court held that a

television reporter had neither a qualified or absolute privilege under the First Amendment to withhold information sought by a grand jury and that Michigan's newspaper reporters' shield law, which failed to cover broadcast journalists, did not violate equal protection.

**21.** See *Philip Morris Cos. v. American Broadcasting Cos.,* No. LX–816–3, 1995 WL 301428 (Richmond Va.Cir.Ct. January 26, 1995) (holding that as a matter of first impression, under the U.S. Constitution the press enjoys a qualified privilege against disclosure of confidential sources in public figure defamation cases using a case-by-case balancing approach).

**22.** See *LaRouche v. NBC,* 780 F.2d 1134 (4th Cir.1985), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *U.S. v. Burke,* 700 F.2d 70 (2nd Cir.1983), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980); *U.S. v. Cuthbertson,* 630 F.2d 139 (3rd Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir.1980), *cert.*

though the Sixth Circuit, in dictum in *In re Grand Jury*, rejected the view held by most circuits that *Branzburg* could be interpreted as creating a qualified privilege, the court did so in the grand jury context and has yet to consider the much different issues raised in a civil proceeding.[23] *See In re Grand Jury*, 810 F.2d at 583–87. Michigan state courts, while denying that an absolute privilege exists under the Michigan Constitution or the state's statutory shield law, have recognized, like most courts, that the First Amendment affords "a qualified privilege against compelled disclosures of confidential sources in a civil case." *King v. Photo Marketing Ass'n Int'l*, 120 Mich.App. 527, 530–531, 327 N.W.2d 515 (1982); *Marketos v. American Employers Ins. Co.*, 185 Mich.App. 179, 191, 460 N.W.2d 272 (1990) (distinguishing *King* as not applying to nonconfidential sources or information).

Unlike the *Branzburg* and *In re Grand Jury* cases which involved grand jury proceedings or other cases where a criminal defendant's Sixth Amendment right to a fair trial was at stake, confidential source questions in civil cases raise different concerns. This is especially true in public figure libel cases which present "a tactical problem that is absent from the analysis in other civil cases because the plaintiff must offer proof of the publisher's subjective state of mind." Bradley S. Miller, *The Big Chill: Third–Party Documents and the Reporter's Privilege*, 29 Mich.J.L.Ref. 613, 620–21 (1996). Neither of the Michigan cases is directly on

point because neither involved a libel case in which the reporter's subjective mind-set was at stake. But in *King*, the Michigan Court of Appeals established at a minimum that "a civil litigant seeking confidential information should not be able to abrogate a news writer's privilege absent a showing that: (1) the requested information goes to the heart of the litigant's case; and (2) the litigant has exhausted all other means of obtaining the information." *King*, 120 Mich.App. at 532, 327 N.W.2d 515 (quoting *Riley v. City of Chester*, 612 F.2d 708 (3rd Cir.1979)). Finally, this Court believes that a third factor implicit in this balance, especially in cases like the one at bar, is the potential harm that may be caused by ordering disclosure of a confidential source's identity. As Justice Powell, whose concurrence in *Branzburg* is cited as articulating the reporter's privilege, stated: "In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Branzburg*, 408 U.S. at 710, 92 S.Ct. at 2671. As such, a case-by-case balancing of constitutional and societal interests is necessary to determine whether First Amendment interests would be jeopardized by ordering disclosure. *Philip Morris*, at 2.

■ First, the Court will analyze the three factors which determine the extent to which the defendant has a qualified privilege to refuse to disclose its source. Then the Court will consider whether under the *Schultz* analysis, it is proper to grant summary judgment without ordering disclosure.

denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Silkwood v. Kerr–McGee Corp.*, 563 F.2d 433 (10th Cir.1977); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir.1972). The Eleventh Circuit inherited the privilege from the Fifth Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir.1981).

**23.** The Sixth Circuit's views in *In re Grand Jury*, are perhaps best understood as a reaction to the argument put forth by the defendant reporter, who though finding himself in the identical fact situation in which *Branzburg* ruled no privilege existed, attempted to argue the opposite. Despite its refusal to recognize even a qualified First Amendment privilege in *In re Grand Jury*, the court went on to say that courts should, even in the absence of a privilege, continue to

> make certain that the proper balance is struck between freedom of the press and the obli-

gation of all citizens to give relevant testimony, by determining whether the reporter is being harassed in order to disrupt his relationship with confidential sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of a confidential relationship.

*Id.* at 586. Some of these factors are obviously not relevant in a civil case like the one at bar. But to the degree this Court has balanced the three factors it does, *infra*, it has satisfied the requirements of *In re Grand Jury* even if that court's discussion of the qualified privilege in the grand jury setting were deemed applicable to a civil proceeding.

### a. Relevancy

Plaintiff contends that the only chance he has to prevail in this case is for him to learn the identity of and depose defendant's confidential source. Without such disclosure, plaintiff argues, he will be not be fully able to evaluate whether or not defendant's employees had reason to trust the accuracy of their source's information. Plaintiff asks: What if the confidential source does not exist and was simply created by defendant's employees after-the-fact to cover their tracks? Only through deposing this source, plaintiff argues, will he have a chance to prove the source does not exist and thus meet the rigorous *New York Times* requirement that plaintiffs prove actual malice.

Although the Court is sympathetic to plaintiff's arguments that he cannot prevail without deposing defendant's confidential source, his desperation is a symptom of a larger problem. Plaintiff has utterly failed to present any credible evidence to date that supports his contention that defendant's confidential source does not exist. Defendant, meanwhile, has countered plaintiff's unsubstantiated assertion with a mountain of evidence supporting its claim that its source not only existed, but was reliable. The key question before this Court is not the subjective mind-set of defendant's confidential source, but rather the state of mind of the journalists working for defendant's newsletter. The Court must focus on whether those journalists believed in the truth of the story they were about to publish. If plaintiff could provide some proof the source was fictitious, his need to depose the source would obviously become relevant to the question of actual malice.

However, as *Schultz* and *Cervantes* both point out, if the summary judgment doctrine is to have any benefit as a device to screen out otherwise meritless libel cases, especially those involving public figure plaintiffs, courts must inquire into the substance of a libel allegation before ordering disclosure of confidential sources. Otherwise, the exception plaintiff appears to propose—allowing plaintiffs carte blanche to depose every defendant's confidential source anytime they otherwise lack evidence of actual malice in a libel suit—would swallow the rule cautioning against disclosure in the absence of compelling evidence that such disclosure would be relevant to the issue of malice. Under such a regime, even plaintiffs who suspected their ultimate case would fail on the merits, could bring lawsuits simply as a harassment device to pester publishers and try to discover who was leaking the information they found damaging. This Court finds that disclosure of defendant's confidential source is therefore of little relevance where plaintiff has failed to meet the *Schultz* requirement of a "concrete demonstration" that the source will provide "persuasive evidence on the issue of malice." *Schultz*, 468 F.Supp. at 567.

### b. Availability of Information By Other Means

Plaintiff would have a much stronger argument for disclosure if this were a case where there was little tangible, physical proof of defendant's mind-set or the editorial process prior to publication of the allegedly defamatory article in *KIR*. In this case, defendant's employees tape-recorded both of their pre-publication conversations with plaintiff. The eleven-page transcript of the November 1, 1994 conversation between plaintiff and *KIR* editor Mike Reynolds, and the nine-page transcript of the December 12, 1994 conversation between plaintiff and *KIR* investigator Joe Roy, provide substantial evidence regarding the subjective views of defendant's employees as they were working on the article in question. As indicated earlier, the Court has also reviewed the detailed notes of the two conversations Roy had with the confidential source prior to publication. In addition, the Court has reviewed the affidavits and deposition transcripts of the parties. Amid this fairly exhaustive record, there is not a hint of any evidence that would help plaintiff establish actual malice. The Court therefore finds that the sheer volume of alternative evidence on defendant's subjective mind-set prior to publication also places this factor in defendant's column.

### c. Potential Harm from Disclosure

As this Court noted in its opinion and order granting a stay of the magistrate's

disclosure order, this case presents particularly troubling concerns regarding the potential harm that may occur if defendant is ordered to disclose its source.[24] Defendant alleges that such disclosure could ultimately result in the death or serious bodily injury of that source and in turn threaten the security of its employees at the Southern Poverty Law Center. While it is impossible to adequately measure such a prediction, it does not mean this Court must ignore it. The Court is not convinced that a protective order would adequately assure no harm would occur. As a former leader in the Michigan Militia, plaintiff holds what can only be described as extremist views. Shortly after 167 persons were killed in the terrorist bombing in Oklahoma City on April 19, 1995, plaintiff was forced to resign from his militia post after publicly blaming the Japanese government for the bombing.[25] Throughout the voluminous record of plaintiff's interviews with the media, he has made it no secret that he holds strong beliefs and is prepared to suffer any consequence,[26] even death, to defend them.[27] In addition, this Court is concerned that the source could be in grave danger if his or her identity were somehow learned by the Aryan Nations, a group that appears to be the actual target of this informant's covert research. A group with a violent past, whose leader has allegedly made death threats against the Southern Poverty Law Center's chief trial counsel, Morris Dees,[28] can hardly be trusted not to act out violently again if it feels threatened by informants.

In addition to any potential physical harm that might befall its source, defendant has made a compelling argument that forced disclosure might also have a dire impact on its future ability to gather news, especially to monitor underground organizations. While this Court passes no judgment on the quality or value of defendant's reporting or the merits of its mission, it cannot help but note the generic danger that forced disclosure presents for any journalistic enterprise. The First Amendment implications of such disclosure were noted by Justice Stewart, who wrote in *Branzburg:*

> No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to · publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions must exist.

*Branzburg,* 408 U.S. at 728, 92 S.Ct. at 2673 (Stewart, J., dissenting). The right to gather news implies a right to a confidential relationship between a reporter and his source. *Id.* As Judge Markow in *Philip Morris* so aptly pointed out: "What kind of confidential relationship can hope to be fostered if a source knows, that despite a reporter's promise not to disclose him, that he may be revealed during the course of discovery in a subsequent libel suit?" *Philip Morris,* at 4. This is especially true for a publication, like *KIR,* which out of necessity must rely heavily on confidential sources to report on the activities of white supremacist organizations which generally prefer to operate out of the public limelight. This factor then clearly favors defendant.

Balancing these concerns against the total lack of concrete evidence by plaintiff of defendant's actual malice, this Court concludes that plaintiff has failed to meet the *Schultz*

24. *See* Opinion, September 25, 1996.

25. Plaintiff and fellow militia leader Norman Olson claimed that Japan bombed the building in retaliation for what they claimed was a CIA-sponsored poison gas attack in Tokyo's subway.

26. Plaintiff was quoted in an October 12, 1994 article of *Metro Times,* a Detroit magazine, as saying:

> I have to accept the idea that my life will never be the same. I sold everything I own and turned my house over to my son. I'm ready to

take whatever abuse comes. We are taking a stand and are prepared to lose everything.

27. In April 1996, plaintiff and Olson attracted national attention when they traveled to Montana to show support for the Freemen, who were in an armed stand off with federal agents.

28. See affidavit of Morris Dees, paragraph 2, 3, as summarized by defendant's brief: "Louis Beam, another Aryan Nations leader, has made a death threat against and placed a bounty on the life of Morris Dees, co-founder and chief trial counsel of the defendant."

requirement that there be "a showing of cognizable prejudice" before failing to order disclosure rises to the level of error. *Schultz,* 468 F.Supp. at 568 (quoting *Cervantes,* 464 F.2d at 994). Having carefully balanced these concerns, the Court holds that on these facts defendant has a qualified privilege under the First Amendment to refuse to disclose the identity of its confidential source. The magistrate judge's order of August 16, 1996, requiring disclosure of defendant's confidential source, will therefore be vacated.

### VI. False Light

The Supreme Court has held that public figure plaintiffs who bring false light invasion of privacy actions against defendants must meet the same actual malice standard as in defamation actions. *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 541–42, 17 L.Ed.2d 456 (1967). For the reasons the Court has outlined in its consideration of plaintiff's defamation claim, defendant's motion for summary judgment on the false light count will also be granted.

### VII. Punitive Damages

This Court, having already concluded that plaintiff's action must be dismissed for failing to provide sufficient evidence of actual malice, need not address plaintiff's arguments that defendant failed to print a retraction within a reasonable time and therefore violated M.C.L. § 600.2911(2)(b) since such action is barred by plaintiff's inability to survive summary judgment under the *New York Times* standard. *See supra.*

A judgment order consistent with this opinion shall issue forthwith.

### ORDER

In accordance with the Court's Opinion of even date,

**IT IS HEREBY ORDERED** that the magistrate judge's order of August 16, 1996, requiring disclosure of defendant's confidential source, is **VACATED.**

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment, (docket # 73), is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is awarded to defendant on all three counts of plaintiff's complaint.