**In re DAIMLERCHRYSLER AG SECURITIES LITIGATION.**

No. 03X70134.

United States District Court,
E.D. Michigan,
Southern Division.

July 2, 2003.

William A. Sankbeil, Kerr, Russell, Laurie J. Michelson, Robin K. Luce, Butzel Long, Detroit, MI, James E. Stewart, Ann Arbor, MI, for movants.

## OPINION AND ORDER

WHALEN, United States Magistrate Judge.

Before the Court is Plaintiffs' motion to compel compliance with subpoenas duces tecum served on Respondents Bill Vlasic and Bradley A. Stertz, third parties to federal securities litigation pending in the United States District Court for the District of Delaware, *In re DaimlerChrysler AG Securities Litigation,* Docket No. 00–0993–JJF (D.Delaware).[1] Respondents filed a brief in oppo-

1. The Lead Plaintiffs in the underlying class ac-      tion, who have brought the present motion, are

sition, and the motion was referred for hearing and determination pursuant to 28 U.S.C. § 636(b)(1)(A). Oral argument was held on March 4, 2003. For the reasons set forth below, the Plaintiffs' motion is denied.

## I.

The underlying lawsuit arises out of the 1998 merger of the Chrysler Corporation with the German corporation Daimler–Benz, dubbed the biggest industrial merger in world history. Plaintiffs allege that Chrysler shareholders were misled into approving the merger by the false and fraudulent representations of Daimler–Benz and its then-CEO, Jürgen Schrempp, that this was to be a "merger of equals," when in fact it was a covert takeover of Chrysler. The fraud was exposed, Plaintiffs say, approximately two years after the merger, on October 30, 2000, when the *London Financial Times* published an article detailing an interview with Mr. Schrempp, in which he revealed that the transaction was never intended to be a "merger of equals," but rather that Chrysler would be a standalone division of his company. The *Financial Times* article stated, in relevant part:

"In a wide-ranging interview ahead of this week's two-day meeting [of the Daimler-Chrysler Management Board], he [Mr. Schrempp] delivered a passionate defence of both the merger and his ambition to create a global car maker."

"In doing so, however, he admitted that Chrysler had been relegated to a standalone division. Far from being a 'merger of equals,' as originally conceived, the deal has emerged as just one deal among several from the 'executive war-room' of Daimler's Stuttgart headquarters."

" 'Now that most of Chrysler's old management board has resigned or retired, Mr. Schrempp sees no reason to maintain the fiction. Me being a chess player, I don't

normally talk about the second or third move. The structure we have now with Chrysler (as a standalone division) was always the structure I wanted,' he says. 'We had to go a roundabout way but it had to be done for psychological reasons.' If I had gone and said Chrysler would be a division, everybody on their side would have said: 'There is no way we'll do a deal.' But it's precisely what I wanted to do. From the start structure, we have moved to what we have today."

The Complaint alleges, *inter alia,* Defendants' violation of Sections 10(b) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), and 17 C.F.R. § 240.10b–5 (intentional misstatement of a material fact in connection with purchase or sale of a security, upon which the plaintiffs reasonably relied to their detriment), and 15 U.S.C. §§ 77k and 77l(a)(2) (untrue or misleading statements in registration statement, prospectus or oral communication, including negligent representations or omissions).[2] Plaintiffs claim that as a result of Defendants' misrepresentations, shareholders who exchanged their Chrysler shares for DaimlerChrysler shares were denied a significant premium which would have been demanded had they known this would be a takeover rather than a "merger of equals," and that shareholders who purchased DaimlerChrysler shares on the open market prior to Mr. Schrempp's public admissions overpaid for those shares.

Respondents Vlasic and Stertz are veteran business reporters for the *Detroit News.* They have covered the automobile industry for a number of years, including reporting on events related to Chrysler and Daimler–Benz prior to the merger. Following the merger, Vlasic and Stertz took a brief leave of absence from the *News* to write a book titled *Taken for a Ride: How Daimler–Benz Drove Off With Chrysler* (William Morrow,

---

the Florida State Board of Administration, Municipal Employees Annuity Fund of Chicago, Denver Employees Retirement Plan, and Policemen's Annuity and Benefit Fund of Chicago. Their case was consolidated with those of two other Plaintiffs, Kirk Kerkorian's Tracinda Corporation, and an investor group referred to as the Glickenhaus Plaintiffs.

2. A more complete summary of the proceedings may be found in Judge Farnan's opinion in *Tracinda Corporation v. DaimlerChrysler AG,* 197 F.Supp.2d 42 (D.Delaware 2002).

2000), an account of the merger and the events leading up to it.[3]

In the course of researching and writing their book, Respondents conducted more than two hundred interviews. In a section of the book labeled "Sources and Bibliography," Respondents state as follows regarding the scope of their research and their understanding with the interviewees about the use of the information provided:

"Every interview was conducted under one ground rule. All material gathered was for exclusive use in this book and would appear in no other publication. Virtually all material in the book is derived from more than two hundred interviews conducted in Detroit, Chicago, New York, Washington, Las Vegas, Los Angeles, Stuttgart, Munich, and Frankfurt. In addition to the 1999 interviews, the authors drew on hundreds of other interviews done during the course of covering Chrysler since 1994. Several of the quotes used in this book were gathered prior to the February 1996 'non-disparagement' agreement between Chrysler and Kirk Kerkorian, Lee Iacocca, and others. The authors also drew on numerous documents on file with the U.S. Securities and Exchange Commission and in various state and federal courts." *Taken for a Ride,* p. 351.

The Respondents go on to identify ninety-seven individuals, by name, as "primary sources" for the book. *Id.,* at 351–53.

On June 3, 2002, the Plaintiffs served Respondents with subpoenas which demanded the production of essentially all notes, recordings, source material, secondary sources and any other material reviewed or utilized in any way in the preparation of *Taken for a Ride,* along with notes or other documents the Respondents may have used in preparation for speaking engagements or other articles regarding DaimlerChrysler. The Plaintiffs specifically set forth a time frame which encompassed documents or materials gath-

ered or produced from January 1, 1994, through the present date. *See Plaintiffs' Motion to Compel,* Exhibit A.

Subsequently, both in written communications to Respondents' counsel and at oral argument before this Court, Plaintiffs narrowed the scope of their request. In a letter to Respondents' counsel dated February 27, 2003, counsel for Plaintiffs limited his request to "only those interview materials (notes, recordings, transcriptions, etc.) that support statements or facts disclosed in the book, *Taken for a Ride: How Daimler–Benz Drove Off with Chrysler.* To the extent that any of the ninety-some interviews conducted by your clients did not give rise to statements or information contained in the book, we do not seek the production of materials relating to those interviews." At oral argument, counsel for Plaintiffs' reiterated that he wanted information relating to all ninety-seven people acknowledged in the book (Tr. 3/4/03, 10), but considered the following people "critical" to the case: Lydia Deininger, Jürgen Hubbert, Roland Klein, Rob Liberatore, Bill O'Brien, Dennis Pawley, and Christoph Walther (Tr. 3/4/03, 12, 16).[4]

Respondents Vlasic and Stertz oppose the enforcement of Plaintiffs' subpoenas on two general grounds: First, they argue that as journalists, they have a qualified First Amendment privilege which protects against disclosure of the material sought by Plaintiffs. Secondly, they argue that the information is statutorily protected from disclosure under the Michigan press-shield law.

## II.

■ Citing *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981), Respondents argue that because, as journalists, their notes and other source material are protected by a qualified First Amendment privilege, the Plaintiffs have "the burden of proving, by a *clear and specific showing,* that the qualified privilege

---

3. According to the bibliography, the reporting and writing process concluded in December of 1999, before Mr. Schrempp's revelations to the *Financial Times.*

4. Counsel also indicated that the following persons, all of whom are identified as sources in the

book, have already been deposed: Eckhard Cordes, Manfred Gentz, Rüdiger Grube, Jürgen Schrempp, Bob Eaton, Gary Valade, Tom Stellkamp, Alex Dibelius, Jim Holden, Steve Harris, Steve Koch, and Tony Cervone (Tr. 3/4/03, 8).

has been overcome." *Respondent's Brief*, at 13 (emphasis in original). Respondents argue that to meet this burden, Plaintiffs must show (1) a compelling need for the information, i.e., they must demonstrate that it "goes to the heart of the proceedings," and (2) that they have exhausted every alternative source for similar material. *Id.*, 13–14.

Most, if not all federal case law either accepting or rejecting the concept of a qualified First Amendment privilege for newsgatherers derives from the Supreme Court's 1972 opinion in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *Branzburg* involved grand jury subpoenas directing journalists to testify concerning alleged criminal activity on which they had reported. Justice White's 5–4 majority opinion was joined by Chief Justice Burger and Justices Blackmun, Powell and Rehnquist. Justice White framed the issue as follows:

> "The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Id.*, 408 U.S. at 682, 92 S.Ct. 2646.

Following a lengthy discussion of the historical role of the grand jury in criminal cases, the *Branzburg* majority held that "the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task." *Id.*, 408 U.S. at 691, 92 S.Ct. 2646. The Court explained:

> "Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.*, 408 U.S. at 690–691, 92 S.Ct. 2646 (footnote omitted).

Although declining to endorse a generalized constitutional privilege for reporters, Justice White's opinion concluded with a recognition that "news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." *Id.*, 408 U.S. at 707, 92 S.Ct. 2646.

Justice Powell filed a separate concurring opinion in *Branzburg*, stressing what he viewed as "the limited nature of the Court's holding," and suggesting that reporters' claims of First Amendment privilege should be scrutinized under a case-specific balancing test:

> "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.*, 408 U.S. at 710, 92 S.Ct. 2646 (concurring opinion of Powell, J.).

There is a divergence of views among the Circuit Courts as to whether *Branzburg* has any application to the subpoena of information from a journalist in a civil case, and the extent to which, in view of the concluding portion of Justice White's majority opinion read in conjunction with Justice Powell's concurrence, reporters retain a qualified First Amendment privilege which is subject to a balancing test.[5] In *Zerilli v. Smith, supra,*

---

5. In *Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D.Wis.1994), the court observed that

for example, the D.C. Circuit read *Branzburg* as sanctioning "a qualified privilege [which] would be available in some circumstances even where a reporter is called before a grand jury to testify." *Id.*, 656 F.2d at 711. *Zerilli* also made note of Justice Powell's concurrence, which it characterized as stating "that courts can determine whether a privilege applies by using a balancing test." *Id.* Ultimately, *Zerilli* held that the *Branzburg* is not applicable to civil cases, where reporters retain a more expansive First Amendment privilege:

> "Although Branzburg may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective criminal law enforcement is absent, that case is not controlling." *Id.*

*Zerilli* also remarked that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege," *id.* at 713, and that in determining whether the privilege should apply, a court should assess the litigants' need for the information and whether they have made efforts to obtain the information from alternative sources. *Id.*

Likewise in *Baker v. F & F Investment*, 470 F.2d 778 (2nd Cir.1972), the court interpreted the *Branzburg* majority opinion in conjunction with Justice Powell's concurrence, finding that reporter's enjoyed a qualified First Amendment privilege which had particular weight in the context of a civil, as opposed to a criminal case:

> "[a]mong the ten circuit courts which have confronted this issue, nine have acknowledged the existence of a *qualified* journalist's privilege to resist compelled disclosure under certain circumstances ... Of the courts which have determined that *Branzburg* is not controlling in civil matters, all have recognized the existence of a limited or qualified privilege in favor of a journalist in civil proceedings." In *United States v. Markiewicz*, 732 F.Supp. 316, 318 (N.D.N.Y. 1990), the court remarked that "the variety of interpretations of *Branzburg* is astonishing."

6. Interestingly, had this motion been brought in the District of Delaware, where the underlying litigation is pending, *Riley* and *Criden* would control. Indeed, in another federal civil case brought in Delaware, *Parsons v. Watson*, 778 F.Supp. 214, 217 (D.Delaware 1991), the court held:

"Manifestly, the [Branzburg] Court's concern with the integrity of the grand jury as an investigating arm of the criminal justice system distinguishes *Branzburg* from the case presently before us. If, as Mr. Justice Powell noted in that case, instances will arise in which first Amendment values outweigh the duty of a journalist to testify even in the context of a criminal investigation, surely in civil cases, courts must recognize that the public interest in non-disclosure of journalists' confidential news sources will often be weightier than the private interest in compelled disclosure." *Id.*, 470 F.2d at 784–785.

In *Riley v. City of Chester*, 612 F.2d 708, 714–715 (3rd Cir.1979), the Third Circuit held that *Branzburg* set forth a narrow and distinguishable exception to the general qualified privilege, grounded in the First Amendment as well as Fed.R.Ev. 501, which attaches to news-gathering. *See also United States v. Criden*, 633 F.2d 346 (3rd Cir.1980), *cert. denied sub nom. Schaffer v. United States*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981).[6]

The Sixth Circuit, however, has dismissed the concept of a reporter's qualified First Amendment privilege in either a criminal or a civil case. In *In re Grand Jury Proceedings*, 810 F.2d 580 (6th Cir.1987), Stone, a television news reporter who was served with a grand jury subpoena, argued that *Branzburg* conferred on him a qualified First Amendment privilege similar to that claimed

"The reporter's privilege recognized by the Third Circuit Court of Appeals is a qualified privilege and may be transcended in a particular case by countervailing interests. *Riley*, 612 F.2d at 715. In order to overcome the qualified privilege, the party seeking to compel a journalist's testimony must establish the materiality, relevance, and necessity of the testimony sought. *Criden*, 633 F.2d at 358; *Riley*, 612 F.2d at 716. The party can make this showing by satisfying three criteria: (1) the testimony sought is crucial to the case; (2) the party has made an effort to obtain the needed information from alternative sources; and (3) the only access to the information sought is through the journalist's testimony. *Criden*, 633 F.2d at 358–59." (Footnotes omitted).

by Respondents in the present case. Rejecting that argument, the Court stated:

"Stone insists, however, that when his reading of Justice Powell's concurring opinion is superimposed upon Justice White's majority decision, the government is required to make 'a clear and convincing showing of relevancy, essentiality, and exhaustion of non-media sources' for obtaining the information before he can be compelled to testify. In arguing that this amounts to a 'qualified privilege,' Stone relies heavily upon the dissenting opinion of three justices in *Branzburg*, and upon opinions from other circuit courts."

"Because we conclude that acceptance of the position urged upon us by Stone would be tantamount to our substituting, as the holding of *Branzburg*, the dissent written by Justice Stewart (joined by Justices Brennan and Marshall) for the majority opinion, we must reject that position." 810 F.2d at 583–584.

Downplaying the significance of Justice Powell's concurrence, the Court in *Grand Jury Proceedings* split with other jurisdictions which recognize a qualified privilege and employ a constitutional balancing test: [7]

"Accordingly, we decline to join some other circuit courts, to the extent that they have stated their contrary belief that those predicates do exist, and have thereupon adopted the qualified privilege balancing process urged by the three *Branzburg* dissenters and rejected by the majority." 810 F.2d at 584 (footnote omitted).

Like *Branzburg*, *Grand Jury Proceedings* involved not a civil case, but a criminal investigation by a grand jury. In *Southwell v.*

*Southern Poverty Law Center*, 949 F.Supp. 1303, 1311–12 (W.D.Mich.1996), the district judge found that for this reason, the Sixth Circuit's rejection of the qualified privilege/balancing approach taken by other Circuits was dictum, and hence not applicable to civil cases. Relying on some of the same cases from which *Grand Jury Proceedings* distanced itself, including *Zerilli*, the court in *Southwell* undertook the three-part analysis criticized by the Sixth Circuit, and found that the defendant-reporter in that case "has a qualified privilege under the First Amendment to refuse to disclose the identity of its confidential source." *Id.*, 949 F.Supp. at 1312–1315.[8]

Given *Branzburg's* lengthy discourse on the historical role of grand juries, and on the heightened societal interest in requiring the testimony of citizens during the course of criminal investigations, it would not be unreasonable to conclude, as many other Circuits have and as *Southwell* did, that civil cases are on a different footing, and *Branzburg* is simply irrelevant to the question of whether a qualified First Amendment privilege exists in civil cases. However, while it is true that *Grand Jury Proceedings*, like *Branzburg*, involved a criminal investigation, it is difficult to characterize its conclusion that reporters simply have no qualified First Amendment privilege as anything but the holding of the case.

"Dictum," or more precisely, "obiter dictum" (translated from Latin as "something said in passing"), is defined as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." Black's Law

---

7. The Sixth Circuit cited the following cases as examples of the "qualified privilege" approach it was rejecting: *Zerilli v. Smith, supra; United States v. Burke* 700 F.2d 70 (2nd Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Cuthbertson*, 630 F.2d 139 (3rd Cir.1980), *cert. denied* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *LaRouche v. National Broadcasting Co.*, 780 F.2d 1134 (4th Cir.), *cert. denied* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); and *Miller v. Transamerican Press, Inc.* 621 F.2d 721 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). *In re Grand Jury Proceedings*, 810 F.2d at 584, fn. 6.

8. *Southwell* also relied on Judge (now Justice) Cavanagh's opinion in *King v. Photo Marketing Ass'n Int'l*, 120 Mich.App. 527, 532, 327 N.W.2d 515 (1982), which endorsed a constitutionally based qualified privilege wherein "a civil litigant seeking confidential information should not be able to abrogate a news writer's privilege absent a showing that: (1) the requested information goes to the heart of the litigant's case; and (2) the litigant has exhausted all other means of obtaining the information." *King*, however, predates the Sixth Circuit's decision in *Grand Jury Proceedings*.

Dictionary at 1100 (7th Ed.1999). Language in an opinion that is dicta is not binding in subsequent cases. *Re/Max International Inc. v. Realty One, Inc.*, 271 F.3d 633, 643 (6th Cir.2001). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

In reaching its decision in *Grand Jury Proceedings*, the Sixth Circuit undertook a detailed analysis of *Branzburg*, and concluded that the very test proposed by Respondents in the present case—that reporters have a qualified First Amendment privilege which can be overcome only if the party seeking the information meets some balancing test—was without support in either Justice White's majority opinion or Justice Powell's concurrence. Rather, the Sixth Circuit found that the only support for the qualified privilege/balancing approach was in Justice Stewart's dissent, which was "rejected by the majority." *Grand Jury Proceedings*, 810 F.2d at 584. Furthermore, in reaching its conclusions, the Court in *Grand Jury Proceedings* explicitly rejected the reasoning and the holding of the very cases from other Circuits on which the Respondents rely in the present case, including *Zerilli v. Smith*, *United States v. Burke*, and *United States v. Cuthbertson. Id.*, at 584–85, fn. 6. The Sixth Circuit's analysis was not a mere passing comment, but central to its ultimate decision. Its statement that *Branzburg* did not create any qualified privilege was categorical, not ruminative.

Indeed, in *Hade v. City of Fremont*, 233 F.Supp.2d 884 (N.D.Ohio 2002), the court criticized *Southwell's* finding that the Sixth Circuit's rejection of the claim of privilege in *Grand Jury Proceedings* was dictum. Quoting *Grand Jury's* language, cited above, that it "declined to join" other Circuit Courts which "adopted the qualified privilege balancing process urged by the three Branzburg dissenters," *Hade* stated:

> "This is a ruling, not merely an ancillary or collateral comment with no authoritative bearing or relationship to the court's re-

sult. The Sixth Circuit's decision in *Grand Jury*, though a minority of one, is the law in this circuit." 233 F.Supp.2d at 888.

*See also Warzon v. Drew, supra*, 155 F.R.D. at 186 (describing the Sixth Circuit's holding in *Grand Jury Proceedings* as follows: "*Branzburg* establishes that there is no journalist's privilege, of any kind, in a *criminal or civil* proceeding" (emphasis in original)).

Therefore, however cogent and persuasive I may find the reasoning of cases such as *Southwell* and *Zerilli*, I am constrained by Sixth Circuit precedent to find that Respondents are not constitutionally shielded by a First Amendment privilege, qualified or otherwise.

### III.

■ The inquiry does not end, however, with the finding that Respondents do not enjoy the protection of a constitutional privilege. Nor does the unavailability of a general qualified privilege render the First Amendment or the Respondents' status as news-gatherers irrelevant to the question of whether these subpoenas should be enforced. In *Grand Jury Proceedings*, 810 F.2d at 585–586, the Court approved a "balancing of interests" approach, distinguishing it from the more stringent application of a privilege-based test:

> "In the sense that the balancing referred to by Justice Powell [in *Branzburg*], when instigated by a reporter seeking to protect a confidential source, may result in the denial to a party of the use of evidence which is reliable, one is reminded of the invocation of a 'privilege,' as contrasted with an 'exclusion' which prohibits the introduction of evidence which is unreliable or calculated to mislead or prejudice. But, this balancing of interests should not then be elevated on the basis of semantical confusion, to the status of a first amendment privilege. Instead, courts should, as did the Michigan state courts, follow the admonition of the majority in *Branzburg* to make certain that the proper balance is struck between freedom of the press and

the obligation of all citizens to give relevant testimony ..." (footnote omitted).[9]

■ In striking such a balance, a court will be guided by the established discovery procedures set forth in the Federal Rules of Civil Procedure. In *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), a libel case involving a newspaper defendant, the Supreme Court, although declining to find a constitutional privilege, stressed the availability, in the Rules of Civil Procedure, of "ample powers of the district judge to prevent abuse," specifically citing Fed.R.Civ.P. 26(b)(1) and 26(c).

In *Marketos v. American Employers Insurance Co.*, 185 Mich.App. 179, 460 N.W.2d 272 (1990), the Michigan Court of Appeals adopted the reasoning of *Grand Jury Proceedings* in holding that a news-gatherer has no First Amendment privilege with regard to non-confidential materials,[10] but added:

"While we refuse to recognize a constitutional privilege, we note that Booth [Newspapers] is not without a remedy to protect it from harassment oppression, and undue burden or expense. Our civil rules of discovery grant the trial courts broad discretion to issue protective orders to prevent the potential abuses feared by Booth:"

[The Court then quotes M.C.R. 2.302(C), which is analogous to Fed.R.Civ.P. 26(c)]

"When, and if, requests for civil discovery become overly burdensome and oppressive to journalists, we expect the trial courts in the exercise of their discretion to issue appropriate protective orders under the court rule." 460 N.W.2d at 280.

It is well established that "the scope of discovery is within the sound discretion of the trial court." *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir.1993); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir.1981). In exercising its discretion, the court should first consider Fed.R.Civ.P. 26(b)(1), which states, in pertinent part:

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ... *For good cause*, the court may order discovery of any matter relevant to the subject matter involved in the action ... All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." (Emphasis added).

In this case, there can be little question that the Respondents' book is "relevant to the subject matter" involved in this action, and the Respondents concede that they "wrote a book on the merger between Daimler–Benz AG and Chrysler Corporation, which is the subject of the litigation brought by Chrysler shareholders in Delaware." *Re-*

---

9. In footnote 7 of its opinion, *Grand Jury* cited *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir.1980), where the First Circuit stated:

"Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a 'conditional', or 'limited' privilege is, we think, largely a question of semantics. The important point for purposes of the present appeal is that courts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights. In determining what, of any, limits should accordingly be placed upon the granting of such requests, courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information." 633 F.2d at 595–596 (footnotes omitted).

I believe that the difference in the two approaches is more than semantic, and arises at least in part from the distribution of the burden of proof. Where a qualified constitutional privilege attaches, the party seeking the information from a reporter has the burden of making "a clear and specific showing" that the information sought is highly material and relevant, critical to the maintenance of the claim, and not obtainable from other available sources. *Zerilli v. Smith, supra; Baker v. F & F Investment, supra*, 470 F.2d at 783–785; *United States v. Burke, supra*, 700 F.2d at 76–77; *Riley v. City of Chester, supra*, 612 F.2d at 716–717. Where the court uses a non-constitutional discovery analysis under Fed.R.Civ.P. 26, the party seeking the information has the burden to establish its relevance, and the reporter the burden of establishing need for preserving confidentiality. *Bruno & Stillman, supra*, 633 F.2d at 597, citing C. Wright & A. Miller, Federal Practice & Procedure, § 2043, at 301–302 (1970).

10. The *Marketos* court's analysis with respect to the Michigan statutory privilege is discussed in section IV, *infra*.

*spondents' Brief in Opposition,* p. 2.[11] Given that the qualified privilege does not apply, it is not necessary to decide whether the Plaintiffs have shown that the information they seek is "critical," or that it "goes to the heart of the proceedings." It is sufficient to say that Plaintiffs have at least made a showing of relevance to the subject matter under Fed.R.Civ.P. 26(b)(1).

The real question is whether, and to what extent, Fed.R.Civ.P. 26(b)(2) serves to preclude or limit discovery.[12] Rule 26(b)(2) states, in pertinent part:

"The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that:(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c)."

Given the admonition of *Branzburg, Herbert v. Lando, Grand Jury Proceedings, and Marketos* that a proper balance be struck between freedom of the press and the obligation of all citizens to provide relevant information in a lawsuit, the inquiry under Rule 26(b)(2) must also take Respondents' status as news-gatherers into account.

I find that the following factors combine to preclude the disclosures sought by the Plaintiffs:

(1) Much, if not all of the evidence the Plaintiffs seek from the Respondents may well be obtainable from other sources which the Plaintiffs have not exploited. The Respondents name ninety-seven people as primary sources for their book. At least twelve have been deposed, including such key players as Jürgen Schrempp, Bob Eaton, and Tom Stellkamp. At oral argument, Plaintiffs' counsel was unable to say how many of the other named sources the principal attorneys, or their investigators, had attempted to contact or interview:

THE COURT: Perhaps you answered this. With the exception of the people who are claiming the protection of the Hague Convention and the people who've already been—the 12 people who have already been deposed, have you attempted to talk to any of the other 90 individuals?

MR. SANKBEIL: I can't—in all honesty I can't answer that, your Honor. (Tr. 3/4/03, 14).

Of the witnesses he considered to be most critical, counsel identified only four—Klein, Walther, Deininger and O'Brien—who posed specific problems in terms of being interviewed or deposed. Klein and Walther, he said, were in Germany, and claimed the protection of the Hague Convention on Taking Evidence Abroad.[13] Deininger was also in

---

**11.** The Plaintiffs state that "the information provided to Respondents in the course of writing *Taken for a Ride* relates directly (and in many instances profoundly) to the claims now being pursued by the Lead Plaintiffs." *Memorandum of Law in Support of Motion Compel Compliance,* p. 7. In terms of specific examples, they cite premerger quotes from Schrempp and Eaton, both of whom have been deposed. They have not made similarly specific claims as to the seven witnesses they say are critical (Deininger, Hubbert, Klein, Libertore, O'Brien, Pawley, and Walther), apparently relying instead on the generalized convergence of the subject matter of the lawsuit and the content of the book.

**12.** Rule 26(c) also provides that the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment oppression, or undue burden or expense," including an order "that the disclosure or discovery not be had." However, since Respondents have not made a specific motion and certification as set forth in that Rule, relying instead on the theory of privilege, I will consider the matter under Rule 26(b)(2), which gives the court discretion to act on its own initiative.

**13.** 23 U.S.T. 2555, 1972 WL 122493 (U.S. Treaty), T.I.A.S. No. 7444.

Germany, and counsel stated, "She will not voluntarily talk to the—to the Plaintiffs." (Tr. 3/4/03, 15). O'Brien, who was Chrysler's in-house counsel, "invoked the attorney/client privilege." (Tr. 3/4/03, 15).[14] As to the other "critical" witnesses, as well as the non-critical witnesses, Plaintiffs have offered only vague assertions that they are not available.[15]

As to the bulk of witnesses who are in the United States, even those who are not to be deposed, it would seem that the easiest way for Plaintiffs to get the information they want is to talk to those people, either through counsel or by means of an investigator. There is no indication, other than generalized and unsupported assumptions that the witnesses are unwilling to talk, that the Plaintiffs have exhausted, or even attempted that possibility.

Furthermore, as to the witnesses who insist on the protections of the Hague Convention—Klein, Walther, and perhaps Deininger—we may assume that they are not inclined to speak willingly with Plaintiffs, but it is important to note that the Hague Convention does not preclude their extraterritorial depositions. As stated in its preamble, the goal of the Convention is a desire "to improve mutual judicial co-operation in civil or commercial matters." Chapter I contains fourteen Articles which set forth the procedures by which one signatory state (the "requesting authority") may request the taking of evidence from a citizen or resident of another signatory state (the "requested authority"), generally according to the laws of the state where the evidence is to be taken. Article 10 provides that in executing a Letter of Request, the requested authority "shall apply the appropriate measures of compulsion" as are provided by its internal laws and judicial procedures. Article 12 sets forth specific limitations on when a signatory state may refuse a Letter of Request.

No doubt obtaining evidence under the Hague Convention is more difficult and more expensive than obtaining discovery within the United States. Nevertheless, there is no indication that Plaintiffs, who are not without the resources to pursue discovery under the Hague Convention, have even attempted to do so, much less shown that such attempt would be ineffectual.[16]

(2) As originally framed in the subpoenas, the information Plaintiffs seek is exceedingly broad, and hence would be exceedingly burdensome, both in terms of the number of witnesses and the time frame involved. In his affidavit, attached as Exhibit B to Respondents' Brief, Mr. Vlasic states that he has approximately 16 bankers boxes of resource material for his book, and that the subpoena "essentially would demand that I search for everything I have in my possession concerning my reporting over an eight year period." Even if narrowed to material related to the seven witnesses identified as "critical," the request for information would be voluminous and burdensome on Respondents.

(3) Apart from any other available discovery, the Plaintiffs have a combined total of 15 depositions to obtain information regarding pre-merger events relevant to the underlying lawsuit. As indicated, many of the principal players, including Schrempp and Eaton, have already been deposed. This is significant for two reasons in a Rule 26(b)(2) analysis. First, the information sought from Respondents regarding individuals who have not or will not be deposed may be precluded if it "is unreasonably cumulative or duplicative." Rule 26(b)(2)(i). Secondly, the Plaintiffs' ability to depose the witnesses provides "an

---

14. Because O'Brien is bound by the Michigan Rules of Professional Conduct, including M.R.P.C. 1.6 (confidentiality of client information), he would not have provided the Respondents with any privileged information. This undercuts Plaintiffs' claim that the Respondents have relevant information regarding O'Brien. To the extent that Plaintiffs seek non-privileged material, including statements made to third parties, O'Brien may be deposed. *See Reed v. Baxter,* 134 F.3d 351, 358 (6th Cir.1998).

15. Counsel stated that he could not make any representations about Mr. Liberatore, and that he was not sure where Mr. Pawley was located (Tr. 3/4/03, 15).

16. One discretionary factor under Rule 26(b)(2)(iii) is the resources of the parties. The combined resources of all the Plaintiffs—including Kirk Kerkorian and his Tracinda Corporation—are formidable.

ample opportunity by discovery in the action to obtain the information sought." Rule 26(b)(2)(ii).

Plaintiffs have not offered anything beyond a generalized claim of relevance to show that the information they seek is not cumulative. In fact, Respondents have submitted the written decision of Special Master Collins J. Seitz, in the District of Delaware, denying Plaintiffs' motion to enlarge the fifteen deposition limit pursuant to Rule 26(b)(2),[17] for much the same reason. Noting that the District Court had limited all Plaintiffs to a combined total of fifteen depositions[18] "after considering the issues in this case and their fact intensive nature," Special Master Seitz stated, at page 6 of his decision:

> "Therefore, in order to succeed on the instant motion, Lead Plaintiffs must show some new development—in light of Rule 26(b)(2) discretionary factors—for the Special Master to revisit this ruling at this stage in the discovery process. Such a showing has not been made."

> "In support of their Motion, Lead Plaintiffs list six subject areas for which they hope to discover information through the additional depositions, and the names of individuals who have information on those subjects. (fn.5) All of these subject areas were before the Court on May 3, 2002, and have not changed. In fact, the Memorandum Order reflects the Court's consideration of the size and intricacy of this action. The Court stated that 'this case is not so complex as to warrant bifurcated discovery.' Mem. Order at 7. Lead Plaintiffs apparently recognize that the requested additional discovery does not pertain to new issues, stating that '[i]n fact, Judge Farnan, in his March 22, 2002 Opinion denying Defendants' motion to dismiss, identified many of the issues that will be the subject of the depositions sought by Plaintiffs.' Motion at 5."

> (fn.5) The six subject areas are: the meaning of the term 'merger of equals,' defendants' alleged misrepresentations, methods

to value the transaction and associated premiums, details of the companies' post-merger integration, possible admissions by Daimler–Benz executives, and the facts underlying defendants' affirmative defenses. Motion at 5–8.

Special Master Seitz also found that the Plaintiffs' request for additional depositions, like their discovery request presently under review, lacked the specificity necessary to make a determination under Rule 26(b)(2), including a determination that the information was not otherwise obtainable by available discovery:

> "Moreover, within each subject area, Lead Plaintiffs simply list the names of individuals and conclude that the deposition of each person is necessary. Listing of names does not satisfy Lead Plaintiffs' burden. Depositions of the named individuals might still be 'unreasonably cumulative or duplicative,' might cover areas where the movant already had 'ample opportunity..to obtain the information sought,' or may cause 'burden or expense ... [that] outweighs its likely benefit.' Fed.R.Civ.P. 26(b)(2)(i)-(iii). At this stage in the proceedings, the Lead Plaintiffs have not demonstrated, with specificity, that each additional deposition is warranted after considering the Rule 26(b)(2) factors." Opinion, at 7.

Likewise, the Plaintiffs in this motion have offered little, if anything, beyond the generalized statement that the subject matter of *Taken for a Ride* is congruent with the subject matter of the lawsuit. More is required to justify the burdensome intrusion into Respondents' files which would be occasioned by enforcing these subpoenas.

(4) The discovery decisions of both the District Judge and the Special Master in the underlying Delaware case limited Plaintiffs' total depositions to 15, based on the court's informed and reasoned assessment of the complexity and size of the case, along with an examination of the Rule 26(b)(2) factors.

---

17. *Respondents' Brief in Opposition,* Appendix A.

18. The District Court granted five additional depositions beyond the ten deposition limit set forth in Fed.R.Civ.P. 30(a)(2)(A). As indicated in the

Special Master's decision, p. 3, the parties agreed that expert witnesses would be excluded from the fifteen deposition limit.

One must question whether a subpoena of the Respondents' files, particularly where Plaintiffs have not exhausted other discovery and investigative options, is in effect an attempt to circumvent those limitations. The question of whether the request (or demand) for information from a news-gatherer is made in good faith was of concern to the Court in *Branzburg* and *Grand Jury Proceedings*, notwithstanding the rejection of a constitutional privilege in those cases. Given the important role that newsgathering plays in a free society, courts must be vigilant against attempts by civil litigants to turn non-party journalists or newspapers into their private discovery agents. While I reiterate that the Sixth Circuit has not adopted the qualified privilege approach of the Second, the following cautionary language of *Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 35 (2nd Cir.1999) is apropos in scrutinizing the good faith of a discovery request even under a Rule 26(b)(2) or 26(c) paradigm:

> "If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through the press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties—particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation ... And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties."

(5) Finally, it is significant that by Michigan statute, M.C.L. § 767.5a(1), any unpublished material the Respondents obtained from their sources is protected from disclosure in a civil case.[19]

Weighing these factors and all of the factors set forth in Fed.R.Civ.P. 26(b)(2) carefully, and looking at the totality of the circumstances, including the Respondents' position as news-gatherers, I find, in the exercise of my discretion, that the information sought by the Plaintiffs is obtainable by other sources less burdensome to Respondents; that Plaintiffs have ample opportunity to obtain the information they seek within the scope of the discovery permitted by the District of Delaware; and that the burden on these third-party Respondents of producing the requested documents outweighs the likely benefit to the Plaintiffs. Therefore, pursuant to Fed. R.Civ.P. 26(b)(2), the Plaintiffs' motion to compel compliance with the subpoenas served on the Respondents will be denied.

## IV.

■ Michigan's press shield law, M.C.L. § 767.5a(1) states:

"A reporter or other person who is involved in the gathering or preparation of news for broadcast or publication shall not be required to disclose the identity of an informant, *any unpublished information obtained from an informant, or any unpublished matter or documentation, in whatever manner recorded, relating to a communication with an informant*, in any inquiry authorized by this act, except an inquiry for a crime punishable by imprisonment for life when it has been established that the information which is sought is essential to the purpose of the proceeding and that other available sources of the information have been exhausted." (Emphasis added).

Citing *Marketos v. American Employers Insurance Co., supra*, Plaintiffs argue that because the identities of the ninety-seven people whom Respondents interviewed and credited are known, any unpublished material in Respondents' possession is not "confidential," and therefore not protected under

---

**19.** This statute, discussed in detail in section IV, *infra*, also represents an independent ground

precluding enforcement of the subpoenas.

Michigan law.[20] Plaintiffs misread both the statute and *Marketos*.

By its terms, M.C.L. 767.5a(1) protects three discrete categories of information: (1) the identity of an informant; (2) unpublished information obtained from an informant; and (3) unpublished documentation relating to a communication with an informant. Category (1) deals with confidential informants, and is not applicable to the present case. Categories (2) and (3), however, apply to unpublished information and documentation, irrespective of whether the source of that information is a confidential informant or a named informant. In other words, a known source can give confidential, unpublished information to a journalist, in which case the information is protected from disclosure.[21] This is precisely what happened in the present case, where named sources gave information to the Respondents with the explicit understanding that the use of any unpublished material would be restricted.

*Marketos* accepted this interpretation of the statute:

> "Although the full gamut of press shield public policy arguments were debated by the Legislature in response to *In re Contempt of Stone*, the Michigan press shield statute still applies only to the identities of informants *and* unpublished information or communications between a journalist and an informant." (Footnote omitted)(emphasis added). 460 N.W.2d at 281.

It is true, of course, that *Marketos* also held that the Michigan press shield law "provides no protection for a request in a civil case for nonconfidential materials." *Id.* However, the facts of *Marketos* provide an example of what the Court meant by "nonconfidential materials." Specifically, *Marketos* involved a civil litigant's subpoena of unpublished photographs taken of a fire by a newspaper photographer. This was not information obtained from an informant, confidential or otherwise, and thus fell outside the clear language of the statute. By contrast, the information the Plaintiffs seek in the present case is unpublished material that was obtained from named informants and relates to communications with those informants. Under M.C.L. 767.5a(1), Respondents may not be compelled to disclose that material.

## V.

For the foregoing reasons, Plaintiffs' Motion to Compel Compliance with Subpoena Served on Third Parties Bill Vlasic and Bradley A. Stertz is DENIED.

SO ORDERED.

20. Plaintiffs also argue that the press shield law is inapplicable to Respondents because when they wrote *Taken for a Ride*, they were on a leave of absence from the *Detroit News*, and therefore were acting outside their capacities as news reporters. This argument is unpersuasive. Clearly, Respondents are long-time business reporters who are well-established in the journalism profession. Prior to employment with the *Detroit News*, Mr. Vlasic was a correspondent for *Business Week*, and Mr. Stertz was a reporter with the *Wall Street Journal*. Before and after their brief leave of absence from the *News*, Respondents reported on the automobile industry, including the relationship between Daimler–Benz and Chrysler, and the *denoument* of the entity now known as DaimlerChrysler. The account of the merger in *Taken for a Ride*, although in book form, is clearly a journalistic endeavor, in that it describes ongoing, newsworthy events which were, and continue to be, of great public interest. Therefore, I find that for purposes of this motion, Respondents are journalists, and in researching and writing their book, they were "involved in the gathering or preparation of news for … publication."

21. That the qualifier "confidential" is not implicit in the term "informant" is clear from Fourth Amendment cases which distinguish between "confidential" informants and "known" or "named" informants in the context of probable cause determinations. *See Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir.2003); *United States v. Pelham*, 801 F.2d 875, 878 (6th Cir.1986).